

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | | |
|---|---|---|
| **LATRICIA NELSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | CAUSE NO. 3:22cv 520 TSC RPm |
| | ) | |
| **MISSISSIPPI COLLEGE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

**JURY TRIAL REQUESTED**

**COMES NOW**, Plaintiff LaTricia Nelson, and states as follows:

**INTRODUCTION**

1.      Plaintiff Professor LaTricia Nelson ("Plaintiff" or "Nelson") is a fifty-one-year-old woman who worked for Mississippi College ("MC") from 2009 until she was terminated in 2020.

2.      Professor Nelson made numerous reports of discrimination to her supervisors, and even to both the President and legal counsel of Mississippi College.

3.      Because of Professor Nelson's reports and allegations against Mississippi College, she began to experience harassment and retaliatory actions.

4.      In August 2019, Professor Nelson received a letter notifying her that her 2019-2020 contract would be her last. At that time, Professor Nelson was the only full-time female instructor in the department.

5.      Professor Nelson was wrongfully terminated for her sex, and in retaliation for her reporting discrimination, harassment, and hostile environment.

1

6.      The discriminatory treatment, harassment, and retaliation Professor Nelson suffered at the hands of MC is in direct violation of Title VII of the Civil Rights Act of 1964.

## PARTIES

7.      Plaintiff Tricia Nelson is a resident of Crystal Springs, Copiah County, MS. Professor Nelson is a white woman.

8.      Defendant Mississippi College is a private educational institution and a Non-Profit Corporation, in good standing and incorporated under the laws of the State of Mississippi, with its principal place of business located at 200 South Capitol Street, Clinton, MS 39056. MC may be served with service of process on its registered agent, Blake Thompson, whose address for service of process is 200 South Capitol Street, Nelson Hall 110, Clinton, MS 39056.

## JURISDICTION AND VENUE

9.      Defendant is subject to the jurisdiction and venue of this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. 1391(b)(1-2).

## FACTUAL BACKGROUND

**A.      Professor Nelson is recruited to join MC as a professor in June 2009, and soon thereafter was promoted as Chair of the Department of History and Political Science.**

10.      Plaintiff Nelson was first hired by Mississippi College in June 2009 as a history professor.

11.      She was hired because of her education, experience, and expertise in paralegal instruction.

12.      Professor Nelson is an Advanced Certified Paralegal, has two master's degrees, a Master of Business Administration, and a Master of Historic Preservation, and has held multiple offices within the Mississippi Paralegal Association, including president, and has been honored with multiple accolades and awards.

2

13.     She was a prominent speaker and was published multiple times in state and national legal publications, including the Mississippi State Bar Association's publication, The Mississippi Lawyer. She was appointed to the Paralegal Committee of the Mississippi Bar as a non-attorney because of her knowledge and experience.

14.     Nelson always went above and beyond in her duties at Mississippi College, receiving favorable evaluations each year. She consistently taught more classes than her colleagues each semester, and even created a new online paralegal program and a new minor in historic preservation.

15.     When she was hired, Professor Nelson was immediately offered the position of Chair of the Department of History and Political Science, where she supervised several full-time and multiple part-time adjunct instructors. Her salary ranged from $90,000 to $110,000 as a department chair, depending on her courseload each semester.

16.     The department thrived under her leadership, until the harassment began in 2012 by a colleague, a male history professor, who was jealous of her appointment as a graduate professor teaching adjunct history courses.

17.     This professor's harassment was severe and pervasive. As an example, he convinced the administration to allow him to move into Nelson's office, taking the office of the only female instructor in the department.

18.     His actions caused Professor Nelson to lose positions of authority on at least one committee, to lose her position as an adjunct history instructor, and to force her to resign from her chair position, which decreased her salary to roughly $80,000 a year.

19.     He also recruited two other male instructors, who also harassed Ms. Nelson, which led to multiple incidents of which the administration was notified yet failed to address.

20.     On one occasion, Nelson was harassed and humiliated by a supervising male colleague in a meeting with several other faculty members. The male colleague communicated to the group private, confidential employment information pertaining to a grievance Ms. Nelson had filed with MC.

21.     Nelson reported the colleague's behavior to MC's administration, but the colleague faced no consequences.

22.     Professor Nelson filed several grievances regarding the continual harassment that she faced from 2012 to her effective termination in 2020. She even spoke with the school attorney and the president, all to no avail.

23.     The president, Blake Thompson, ignored her after telling her would investigate her claims and get back to her.

24.     The school attorney, Dr. Bill Townsend, was similarly dismissive of her claims and went so far as to make a sexist remark in the meeting. He told Professor Nelson that he "would talk to her when she was less emotional."

**B.      Plaintiff learned that her contract would not be renewed past 2020 because MC was "reorganizing the paralegal program" due to decreased enrollment in the program, when in fact the enrollment had not decreased.**

25.     On August 23, 2019, Professor Nelson received a letter from MC notifying her that her 2019-2020 contract would be her last contract.

26.     This letter stated that MC was "reorganizing the paralegal program" based upon "the total number of paralegal students" decreasing "from 40 to 26 in five years."

27.     However, the paralegal program did not have a decline in enrollment, despite MC's proffered reason for her termination.

4

28.     In fact, Professor Nelson immediately filed a grievance letter on September 6, 2019 challenging MC's characterization of the program. *See* **Exhibit A**, 9/6/2019 Grievance Letter.

29.     Her letter included data and enrollment records showing that the paralegal program had at least 41 students, more students that some of her male, non-tenured, colleagues.

30.     She also noted that because the program was almost exclusively an online program that generated technology fees in addition to tuition fees, the program was generating substantially more money than other programs in her department.

**C.      MC violated several of its own policies set forth in its Policies and Procedures Manual.**

31.     The grievance also alleged violations of MC's own internal policies based upon MC's Policies and Procedures Manual (the "Manual"), which was incorporated into Professor Nelson's 2019-2020 contract. MC was therefore bound to adhere to the policies and procedures set forth in the Manual, which it did not do.

32.     **Policy 1.10** prohibits "discrimination on the basis of race, color, national or ethnic origin, sex, age, genetic information, veteran status, disability or the provision of services."

33.     **Policy 3.11** provides that "neither sexual harassment nor inappropriate fraternization will be tolerated by Mississippi College."

34.     **Policy 1.09** ensures Plaintiff's freedom from "retaliation, intimidation, harassment, or other adverse actions against members of the University community for making good faith reports of unlawful discrimination or harassment."

35.     Professor Nelson reported on numerous occasions to her superiors that she was being harassed by the male colleagues in her department because of her sex, but the school failed to address these ongoing issues. Instead, MC made it worse through both its actions and inactions in addressing these issues that first began in 2012 and ultimately resulted in her termination in

2020. In so doing, MC created a hostile environment and propelled a pattern of continual harassment.

36.     Nelson was also harassed by Dr. Debbie Norris, Dean of Graduate Studies, and Title XI coordinator, after she confided in her how she was being harassed by three men in her department and asked for her guidance. Dr. Norris stated she could not help her and then she began to harass Ms. Nelson.

37.     On one specific occasion in 2017, Dr. Norris filed a complaint with Ms. Nelson's superior Dr. Ron Howard and provided false information, which Professor Nelson was able to refute, and which is documented. Dr. Norris was furious her complaint was dismissed for lacking merit and containing false information.

38.     In 2019, Dr. Norris was temporarily placed in a position of authority above Professor Nelson and immediately used her position of authority to notify Professor Nelson that her current contract would be her last.

39.     In the process of culling some redundant and unnecessary faculty, she abused her authority and falsely claimed that the program did not have enough students when she knew well that it did and had the proof. Dr. Norris did not question the programs of her male, non-tenured counterparts who had less students than she.

40.     Professor Nelson proved to the school, with data, that her program was making more money than most of the others in her department, and therefore, the claim that it was a financial burden was unfounded.

41.     Further, **Policy 1.11** provides that MC cannot award degrees without having a full-time director of a program from which the degrees are being awarded. MC continued to admit and enroll students to the paralegal program up to the day Professor Nelson left employment. The same

classes and schedule Professor Nelson taught each semester were on the schedule for the following school year.

42.     There was no "reorganizing" of the paralegal program. MC simply assigned her classes to adjunct instructors.

43.     **Policy 1.19** governs the modification of programs. Under 1.19, the decision to make a "substantive change" in a program, including the addition, modification, or closure of programs, must follow specific guidelines, including but not limited to, notifying the relevant director, department, committees, and individuals.

44.     None of the mandated steps were taken.

45.     **Policy 3.01** provides that "by the end of the spring semester each year," MC will "provide faculty members with notice of their status for the following year.

46.     Immediately upon receiving the non-renewal letter on August 23, 2019, Nelson informed MC's administration, including attorney Bill Townsend, that she had not been given adequate notice. Contracts are awarded in the spring, and Professor Nelson signed her contract May 10, 2019. This is when she should have been informed of the non-renewal, not in the fall of 2019.

47.     Similarly, **Policy 3.04** governs faculty separation. It provides, "If a non-tenure track faculty member has been given seven successive one-year contracts, any notice of non-renewal must provide one calendar year's notice."

48.     Contracts run from August to May for each school year.  To be given a "calendar year's notice," Nelson should have been informed in May of 2019, not August, after her final school year had begun. The 2019-2020 contract she signed stated she was employed through May, not August.

49.     The sole reason Nelson was employed until August 2020 is because MC attempted to remedy the deficient notice by stating they would allow her to teach summer courses, which would give her a year's notice.

50.     Nelson informed Dr. Townsend that this did not remedy the fact that she was not given a calendar year's notice.

51.     Further, under the grievance policy, Nelson was not afforded the ability to file a grievance based upon her termination and therefore had no redress for the deprivation of due process.

52.     She did, however, file a grievance based upon the fact that other policies were not followed, especially concerning "reorganizing" a program and the steps that must be taken before the program can be modified.

53.     MC's Administration consistently favors men over women in positions of leadership and authority and this bias has led to inequality for women. The college fails to adhere to its own policies – the same policies that instructors and professors are expected to adhere to because they incorporated each employee's contract.

54.     Professor Nelson alleges civil rights violations, including gender discrimination age discrimination, and retaliation. She also asserts various state violations, including wrongful termination, hostile work environment, workplace harassment, and breach of contract

55.     Nelson has suffered damages as a result of the wrongdoing by MC's administration and employees. Over the course of her employment, Nelson's pay decreased from $110,000 a year to $90,000. Upon her termination, she worked as a paralegal making $48,000 from September 2020 to July 2021. Last year, she began working as a teacher at Crystal Springs High School,

making $53,000. Currently, Nelson works as a teacher at Gary Road Elementary School for $63,000.

## COUNT 1: BREACH OF CONTRACT/WRONGFUL TERMINATION

56.    Professor Nelson adopts and incorporates all preceding paragraphs as if fully set forth herein.

57.    Professor Nelson entered into an employment contract with MC in 2009.

58.    Pursuant to MC's policies and procedures, Professor Nelson was entitled to be notified in the spring semester of her employment status for the following school year.

59.    On or about August 23, 2019, Professor Nelson was notified that her 2019/2020 employment contract would not be renewed.

60.    Defendant MC breached its duty pursuant to the employment contract and/or its policies and procedures by failing and refusing to provide adequate notice to Professor Nelson.

## COUNT 2: GENDER DISCRIMINATION
### (Including Hostile Work Environment)

61.    Professor Nelson adopts and incorporates all preceding paragraphs as if fully set forth herein.

62.    This discrimination and retaliation by Professor Nelson's male counterparts and supervisors ultimately contributed to the school's termination of Professor Nelson.

63.    Professor Nelson reported on numerous occasions to her superiors that she was being harassed by the male colleagues in her department because of her sex, but the school failed to address these ongoing issues. Instead, Defendant MC made it worse through both its actions and inactions in addressing these issues that first began in 2012 and ultimately resulted in her

termination in 2020. In so doing, MC created a hostile environment and propelled a pattern of continual harassment.

64.     Professor Nelson was also harassed by Dr. Debbie Norris, Dean of Graduate Studies, and Title XI coordinator, after she confided in her how she was being harassed by three men in her department and asked for her guidance.  Dr. Norris stated she could not help her and then she began to harass Professor Nelson.

65.     On one specific occasion in 2017, Dr. Norris filed a complaint with Professor Nelson's superior Dr. Ron Howard and provided false information, which Professor Nelson was able to refute, and which is documented. Dr. Norris was furious her complaint was dismissed for lacking merit and containing false information.

66.     In 2019, Dr. Norris was temporarily placed in a position of authority above Professor Nelson and immediately used her position of authority to notify Professor Nelson that her current contract would be her last. In the process of culling some redundant and unnecessary faculty, she abused her authority and falsely claimed that the program did not have enough students when she knew well that it did and had the proof. Dr. Norris did not question the programs of her male, non-tenured counterparts who had less students than she. Professor Nelson proved to the school, with data, that her program was making more money than most of the others in her department, and therefore, the claim that it was a financial burden was unfounded.

67.     As a result of this discrimination, Professor Nelson has been damaged by the sex discrimination and hostile work environment created by her male counterparts and supervisors in an amount to be proven at the trial of this matter.

68.     As a direct, legal and proximate result of the gender discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial. As a result of

Defendant's actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for equal pay violations at trial, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees and costs, and other compensation.

## COUNT 3: RETALIATION IN VIOLATION OF TITLE VII

69.     Professor Nelson adopts and incorporates all preceding paragraphs as if fully set forth herein.

70.     Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

71.     Plaintiff made informal and formal complaints to Defendant's agents and employees opposing Defendant's unlawful, discriminatory employment practices based on sex.

72.     As a result of Plaintiff's complaints, Defendant's agents and employees took materially adverse actions against Plaintiff, including, but not limited to, reprimanding her in front of her peers and supervisor, covert meetings with Plaintiff's peers to specifically discuss Plaintiff's employment.

73.     Defendant's adverse actions constituted retaliatory workplace harassment.

74.     Defendant's retaliatory actions would deter a reasonable employee from engaging in protected activity under § 1981.

75.     As a direct, legal and proximate result of the retaliation, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial.

11

76.     As a result of Defendant's actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial.

77.     Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available at trial, including liquidated damages for all willful violations, pre- and post- judgment interest, attorneys' fees and costs, and other compensation.

## COUNT 4: RETALIATION IN VIOLATION OF MISSISSIPPI LAW

78.     Plaintiff adopts and incorporates all preceding paragraphs as if fully set forth herein.

79.     Plaintiff was discharged in whole or in part for reporting illegal discriminatory acts to Defendant's agents and employees.

80.     Further, Plaintiff was discharged in whole or in part for Defendant's belief that she reported illegal discrimination and harassment.

81.     Plaintiff refused to participate in illegal and/or unethical acts desired by Defendant.

82.     As a direct, legal and proximate result of the retaliation, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial.

83.     As a result of Defendant's actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial.

84.     Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available at trial, including liquidated damages for all willful violations, pre- and post- judgment interest, attorneys' fees and costs, and other compensation.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests the following relief:

A. For a declaration that Defendant's actions, policies, and practices as alleged herein are unlawful;

12

B.  For lost wages and all other compensation denied or lost to Plaintiff by reason of Defendant's unlawful actions, in an amount to be proven at trial;

C.  For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

D.  For punitive damages in an amount to be determined at trial;

E.  For liquidated damages;

F.  For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

G.  For an order enjoining Defendant from engaging in the unlawful acts complained of herein;

H.  For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 2000e-5(k), § 216 of the Equal Pay Act, the ADEA, and pursuant to Mississippi law, the exact amount to be shown at the trial of this cause; and

I.  For such other and further relief as this Court deems just and proper.

Respectfully submitted, this the 9th day of September 2022.

LaTricia Nelson, Plaintiff